| | |
|---|---|
| ABDI HAJIFARAH & KALI HIRAD ) | |
| d/b/a/ AFRICAN STORE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Docket no. 2:09-cv-653-GZS |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

The Court held a bench trial in this matter on December 28-29, 2010. The bench trial transcript was filed on January 10, 2011 (Docket #s 42 & 43). The parties each filed Proposed Findings of Fact and Conclusions of Law on January 31, 2011 (Docket #s 44 & 45) and supplemental response memoranda on February 14, 2011 (Docket #s 46 & 47). In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

**The Plaintiffs & The African Store**

1. In March of 2008, Plaintiffs Abdi Hajifarah ("Hajifarah") and Kali Hirad ("Hirad"), who are married, purchased and began operating the African Store located on Lisbon Street in Lewiston, Maine. The purchase of the store was finalized in May of 2008.

2. Hajifarah and Hirad immigrated to the United States from Somalia. English is not their primary language, and they used the services of an English-language interpreter during trial.

3. The couple first moved to Lewiston around 2001, then moved to Burlington, Vermont for several years in 2005 or 2006, before returning to Lewiston in 2008 when they purchased the African Store.

4. For the most part, Hajifarah and Hirad run the store without the assistance of any employees, although sometimes one or two of their children also help out.

5. The African Store is one of several Somali specialty stores in and around Lisbon Street. Generally, these Somali specialty stores cater to the Somali community in the Lewiston-Auburn area by carrying food items—including halal food products and other staples of the Somali diet such as particular oils, powdered milk ("Nido"), rice and pasta—that typically cannot be found at the local chain supermarkets or Walmart, especially in bulk quantities.

6. At trial, Hirad explained that "halal" means something that is permissible to engage in according to Islamic law and typically refers to the way meats are prepared or prohibitions on consuming meat of certain animals. The African Store does not have a meat section; it does, however, sell halal-certified products such as chicken broth, canned fish and certain processed food where the customer might not otherwise be assured that there is no hidden animal product.

7. When Hajifarah and Hirad first moved to the Lewiston area in 2001, there were no Somali specialty stores and they would drive down to Boston to buy halal-certified food. There are now approximately ten other Somali specialty stores in the same general area as the African Store.

8. Approximately eighty percent of the African Store's customers are Somalis.

9. The African Store is located near Baraka and Mogadishu, two other Somali specialty stores which, unlike the African Store, have large meat sections.

10. The African Store differs from Baraka, Mogadishu and other competitors by making available for purchase large bulk quantities of staple food products.[1]

11. The African Store does not stock either alcohol or tobacco products for sale.

12. Prices are set at the African Store; there is no haggling.

13. Hajifarah and Hirad presented testimony and evidence to establish that Somalis tend to have large families, who by necessity, purchase and consume a great deal of food. One witness for the Plaintiffs testified that she had six children. Another witness, who testified that there were ten individuals living in her household, stated "I'm a big family and we use a lot of food." (Tr. of Proceedings Vol. II (Docket #43) at 146.)

14. Hajifarah and Hirad have nine children. Hirad testified that she buys in bulk given that her family, for example, can easily consume up to forty pounds of rice over the course of ten days and use three half-kilo packages of pasta over the course of a month.

**The Supplemental Nutrition Assistance Program**

15. The Defendant in this action is the United States government. Specifically, Plaintiffs seek relief for actions that were taken by the United States Department of Agriculture ("USDA"). Within the USDA, the Food and Nutrition Services ("FNS") operates the Supplemental Nutrition Assistance Program ("SNAP"), formerly and more commonly known as food stamps.

---

[1] While the African Store does make products available in large sizes (*e.g.*, a forty pound bag of rice), the customer does not receive any sort of discounted price incentive for buying products in bulk.

16. Very shortly after they began operating the African Store in March of 2008, Hajifarah and Hirad applied for and received approval to accept SNAP benefits.

17. During the first year of the African Store's participation in SNAP, the vast majority of its customers were SNAP benefit recipients.

18. Other Somalia specialty stores in and around Lisbon Street in Lewiston, including Baraka and Mogadishu, also participate or have participated in SNAP.

19. SNAP utilizes an Electronic Benefit Transfer ("EBT") system, and SNAP recipients obtain their benefits through an EBT card.

20. Each month, Defendant or its agents electronically transfer SNAP benefits into recipient accounts. Recipients use their EBT cards much like a debit card to pay for eligible food purchases at authorized stores.

21. Stores participating in SNAP have a point-of-sale device (also known as an EBT machine) that allows food stamps to be processed with this benefits card.

22. For each food stamp transaction, the customer must use a confidential personal identification number ("PIN"). Accordingly, for every food stamp transaction, the customer must be in the physical presence of the PIN device.

23. For the purposes of SNAP, the African Store is classified as a small convenience store.[2]

24. In Maine, SNAP benefits are distributed on the ninth through the twelfth or thirteenth of each month; correspondingly, the African Store's busy period is when SNAP benefits are distributed and the immediate days thereafter.

25. A typical transaction at the African Store begins when the customer brings the desired item(s) to the counter.

---

[2] Baraka and Mogadishu, by contrast, are classified as "SG" ("small grocery") and "MG" (which the Court assumes to be medium grocery) respectively. (See, e.g., Def. Ex. 103 at USDA-00041, USDA-00059; Tr. of Proceedings Vol. II at 220.)

26. No scanner is used, but the price is usually attached to the item. Hajifarah or Hirad adds up the prices on a calculator and then shows the customer the total. Hajifarah provides the customer with a calculator so there is no doubt about the accuracy of the transaction.

27. Hajifarah next rings in the amount on the African Store's cash register (but the customer cannot see the amount as reflected on the cash register).[3]

28. Hajifarah does not charge the SNAP card until after the amount is agreed upon by the customer. After the customer agrees to the price, Hajifarah then swipes the card in the machine and hits the total button on the cash register.

29. At this point, the customer must type in his or her confidential PIN.

30. Finally, Hajifarah gives the customer the cash register receipt and the SNAP EBT machine receipt.

31. The EBT machine generates two receipts, one of which is given to the customer and one of which is kept by Hajifarah and Hirad.

32. Unlike the EBT machine, the cash register at the African Store prints out only one receipt, which is given to the customer. As such, there is no contemporaneous record of the African Store's cash transactions because, other than the cash register receipt given to the customer, the African Store's cash register does not generate any other transaction record.

33. Hajifarah and Hirad also bag the groceries, and Hajifarah helps the customer carry them.

---

[3] Hirad does not know how to use, and therefore does not operate, the cash register at the African Store. Hajifarah therefore handles all of the cash transactions. Hirad's testimony makes clear that she does know how to handle the SNAP EBT transactions.

**Defendant's Initial Visit to the African Store (April 2008)**

34. Deborah Crosby ("Crosby") has been employed by FNS for twenty-two years, first as a Program Technician processing applications, and for the past ten years as a Specialist responsible for compliance work. Crosby is Maine's only USDA Specialist.

35. Crosby first visited the African Store on April 17, 2008. The purpose of this visit was to determine whether the store had a sufficient number of eligible food stamp items for sale.

36. During this visit, Crosby spoke with Hajifarah in English and Hajifarah responded in English. No interpreter was present.

37. The African Store is small, measuring approximately sixteen feet by thirty feet, and has a narrow entryway. The store has one front counter, measuring about two feet by two feet. These physical features would make it logistically difficult for the store to process many customers at the same time.

38. From Crosby's perspective during this initial visit, the store and the counter appeared very cluttered. Photographs taken by Crosby during this visit corroborate this observation. (See Def. Ex. 102 at USDA-00015 to USDA-00029.)

39. During this initial visit, the African Store's inventory included a significant amount of clothing, head scarves, phone cards, perfume and jewelry.

40. At the time, the store had no shopping carts or optical scanners.

41. At the time, the store had no hot food, no food for on-site consumption, no equipment to heat food, no deli, no prepared food section, and no salad bar. There was also no fresh meat, although there were cans of tuna fish.

42. Prices were marked on each item in the store, and all of the items Crosby examined ended in $.00.

43. Crosby did not examine the prices of every item in the African Store, including the refrigerated drinks.

44. During this visit, Hajifarah told Crosby that in two weeks he intended to put in a meat cutting room for goat and camel, and that he would also carry fish and chicken in a freezer section.

45. The African Store had one check-out counter where one SNAP point-of-sale device, one PIN device, one cash register and one machine for processing credit/debit cards were all located.

46. Crosby recorded her notes and photographs from her April visit in an official FNS Survey Form. (See Def. Ex. 102.)

47. Following Crosby's initial store visit, Hajifarah, Hirad and the African Store were approved to start accepting SNAP benefits on or about May 5, 2008.

48. USDA records reflect that between July 2008 and December 2008, the African Store redeemed a total of $39,771.65 in SNAP transactions. (See Def. Ex. 129.) While Hajifarah's tax returns for the period from July 1, 2008 to December 31, 2008 reflects SNAP sales of only $27,234 (see Def. Ex. 122), Hajifarah testified at trial that he had once done his taxes incorrectly and incompletely and that he had later corrected them and paid the deficiency.

**Defendant's Investigation of Trafficking[4] at the African Store (May – September 2009)**

49. The EBT system enables FNS to track benefits from the recipient to the retailer, recording information on each benefit transaction. The stored electronic data includes the

---

[4] As will be explained in the Court's Discussion, *infra*, the term "trafficking" refers to the exchange of food stamp benefits for cash. SNAP also prohibits the use of food stamp benefits for ineligible items, but the purchase of ineligible food items is not considered to be "trafficking." (See Tr. of Proceedings Vol. II at 242.) In any event, both Hajifarah and Hirad credibly testified at trial that they have never exchanged SNAP benefits for any ineligible items.

household number, the recipient's card number, the amount of the SNAP purchase, the store number, and the date and time of the transaction.

50.  When a SNAP point-of-sale device is swiped in a store, that transaction is transmitted on a daily basis to what is known as FNS' ALERT system.  As explained by Crosby at trial, the ALERT system is a computer program that gathers these daily transactions and analyzes the data, based upon specific parameters that are programmed into the system, to detect patterns that indicate fraud.  (See Tr. of Proceedings Vol. II at 176.)  The ALERT system does not identify how many items were purchased in a specific transaction.

51. The ALERT system generates raw data reflecting the likelihood that the store is engaging in fraud.  This computer system does not determine or conclude that trafficking has occurred.

52. Rather, the compliance center investigator then analyzes the raw transaction data, often in conjunction with other factors such as observations from store visits, an analysis of customer shopping behavior and a comparison of stores in the area, to render a determination about whether the questionable transactions were the result of trafficking.

53. Crosby began her investigation of the African Store when the FNS ALERT System data reflected patterns of SNAP EBT transaction characteristics indicative of trafficking: rapid and repetitive transactions; same household transactions; and large dollar transactions.

54. After the ALERT system identified these categories of suspicious activity patterns at the African Store, Crosby pulled the transaction data for the months of May, June and July of 2009 to see if there was some reasonable explanation that would account for that

particular type of transaction at the store. During this selected time period, the African Store had been SNAP authorized for just over one year.

55. At the time the ALERT program generated this data, the African Store was classified as a small grocery store based upon Hajifarah's representation that he would install a meat room. Crosby later determined that the African Store was more properly classified as a small convenience store because their food sales are less than sixty-five percent of their gross sales. There is no evidence in the record that would assist the Court in determining precisely how this initial misclassification would change both the data generated, if at all.

56. To investigate these suspicions, Crosby made a second visit to the African Store on September 2, 2009. The purpose of this visit was to observe the nature and scope of the store's operation, stock and facilities in an attempt to ascertain whether there were justifiable explanations for the transaction patterns that appeared indicative of trafficking.

57. During the September 2009 store visit, Crosby again spoke with Hajifarah. After identifying herself, she explained that she was doing a store visit. Hajifarah accompanied Crosby as she walked around the store to conduct her investigation.

58. Crosby spoke to Hajifarah in English and Hajifarah responded in English. No interpreter was present.

59. Crosby's September 2009 store visit lasted approximately forty-five minutes.

60. In her conversation with Hajifarah, Crosby reminded him about his prior comment regarding his intention to sell fresh meat; Hajifarah responded that saws for cutting the meat were expensive and he had been unable to find saws that he could purchase.

61. Crosby also inquired as to whether there were any problems with the SNAP point-of-sale device, and Hajifarah responded that there were none.

62. Crosby inspected the counter area and noted that there was still only one SNAP point-of-sale device.  The counter space still was small and cluttered.

63. Crosby also noticed that the store still had very limited food product available.

64. Upon inquiry, Hajifarah confirmed that all the items sold were visible and that the store had no official delivery service.

65. Crosby noted that the items continued to be priced in even dollar amounts.

66. Crosby inquired about the price of a large bag of Basmati rice, which was unmarked.  Hajifarah responded that it was fifty-six dollars.

67. The bags of rice were the most expensive item in the store.  Bertoli Olive Oil was priced at thirty dollars, and Nido cost twenty-nine dollars.

68. The small containers of spices were marked in the even $.00 amount ranging from $2.00 to $10.00.

69. In September of 2009, there were still no shopping carts, shopping baskets or optical scanners at the African Store.

70. Because SNAP benefits are distributed into recipient accounts in the middle of each month, many retailers stock their inventory during the first half of the month in anticipation of a surge of SNAP purchases.

71. On September 2, 2009, however, Crosby noticed that there was no empty space on the shelves that would have allowed for the delivery of large amounts of additional food items.

72. Crosby recorded her notes from this September 2, 2009 visit in an FNS computer survey form.  (See Def. Ex. 107.)

73. Crosby did not interview or have any other type of contact with any of the African Store's customers, although this is an investigative technique she has employed in other cases.

74. Similarly, Crosby did not deploy an undercover agent or investigator to the African Store to attempt to conduct a trafficking transaction, even though this is an investigatory method she has employed in other cases.

75. Following her visit, Crosby concluded that rapid and repetitive transactions are highly implausible in a store the size and configuration of the African Store, with a very small counter area and only one point-of-sale device. More specifically, for the transactions flagged by the computer program, Crosby found that there was insufficient time to (a) bring the purchased items to the counter; (b) enter the prices in the cash register; (c) swipe the SNAP EBT card; (d) enter the SNAP PIN number; (e) move the items off the counter; and (f) bag the items for the customer.

76. Crosby also concluded that rapid transactions by the same household at the African Store would also be unusual for the added reason that customers do not usually shop repeatedly at the same store in such short time frames.

77. Crosby also concluded that high dollar transactions were suspicious because the African Store carried no high dollar meats or prepared foods that could have reasonably accounted for the transactions.

78. Additionally, Crosby found that many of the African Store's transactions were also implausible because the total amount ended in $.99, but during her visits she did not see any items priced for that amount that were also eligible for purchase with SNAP benefits.

79. Overall, in light of her observations during this visit and her assessment of the data generated by the computer system, Crosby determined that Hajifarah and Hirad had been engaging in trafficking.

**The Charge Letter (September 3, 2009) & Supporting Data**

80. By letter dated September 3, 2009, USDA issued its determination that the African Store had acted in violation of the terms and conditions of the SNAP regulations, 7 C.F.R. §§ 271-283. This letter constituted Hajifarah and Hirad's first notice that they were being accused of trafficking.

81. The Charge Letter states that this determination was based on Crosby's investigation and analysis of the May, June and July 2009 EBT transaction records, which revealed "clear and repetitive patterns of unusual, irregular, and inexplicable activity … ." (Def. Ex. 104A at A.R. 56.)

82. The Charge Letter further states, in relevant part, that the sanction for such violations is permanent disqualification from SNAP, even though "[u]nder certain conditions, FNS may impose a civil monetary penalty … in lieu of a permanent disqualification … ." (Id.)

83. The Charge Letter includes a listing of the individual transactions upon which USDA based its decision, separated into the three aforementioned categories: rapid transactions; rapid transactions by the same household; and excessively large transactions.

84. There is significant overlap amongst the transactions identified on the three attachments.

*Attachment 1: Transactions "made too rapidly to be credible"*

85. For transactions alleged to be performed too rapidly to be credible, the ALERT system flagged any two transactions conducted less than eight minutes apart.

86. These sets of transactions involved both the same and multiple households.

87. As one example, on May 5, 2009, the African Store processed a $110.00 SNAP transaction at 7:33:38 pm for household #623A, which was followed by another $110.00 SNAP transaction at 7:34:17 pm for the same household. This transaction is listed as an identified suspicious transaction on both Attachment 1 (rapid transactions) and Attachment 2 (rapid transactions by the same household) to the Charge Letter. (See Def. Ex. 104A at USDA-00063 & USDA-00070.)

88. Plaintiffs' own SNAP receipts validate that on the same date, within seconds of those transactions, the African Store generated receipts for a customer utilizing SNAP benefits who processed two $110 transactions only thirty-nine seconds apart. (See Def. Ex. 126, USDA-00623 & USDA-00624 (for card # 7207).)

89. Similarly, on May 2, 2009, a customer from household #8807 conducted a $155.00 SNAP transaction at the African Store at 1:12:55 followed by a $145.00 SNAP transaction less than two minutes later. (See Def. Ex. 104A at USDA-00063.) Then, on June 17, 2009, a customer from this same household conducted two separate $199.99 SNAP transactions at the African Store at 12:27:47 pm and 12:28:24 pm. (See id. at USDA-00067.)[5] Plaintiffs' own SNAP receipts again validate that these transactions occurred. (See Def. Ex. 126 at USDA-00619; Def. Ex. 127 at USDA-00967 (for card # 9023).)

90. On May 12, 2009, the African Store conducted a SNAP transaction with a customer from household #823A for $36.00 at 3:42:38 pm. Just fifty-seven seconds later at 3:43:35 pm, the African Store conducted a $100.00 SNAP transaction with a customer from a different household (#343A). Just forty-nine seconds later at 3:44:24 pm, the African Store conducted another $100.00 SNAP transaction with a customer from yet a different

---

[5] These same four transactions are included as separate violations on Attachments 1, 2 and 3. (See id. at USDA-00063, 00067, 00070-71, & 00075-76.)

household (#323A).  (See Def. Ex. 104A at USDA-00063 to USDA-00064.)  Plaintiffs' own SNAP receipts again validate that these back-to-back transactions occurred.  (See Def. Ex. 126, USDA-00656 to USDA-00657 (for card #s 1765, 3820 & 7762).)

91. On specific days between May and July of 2009, there were fifty-seven SNAP transactions at the African Store, totaling $6,442.60, which were categorized as being too rapid to be credible and therefore indicative of trafficking.  This works out to be an average of nineteen suspicious transactions per month.

92. Not surprisingly, the majority of the transactions flagged as suspicious on Attachment 1 to the Charge Letter occurred in the days during and after the ninth to the thirteenth of each month (when SNAP benefits are distributed).

93. In the three month period at issue, there were 204 additional transactions occurring in three minutes or less that were not considered or listed by the government as trafficking or otherwise suspicious because, *inter alia*, the transactions did not also involve large dollar value amounts.  Again, and not surprisingly, the majority of these additional, smaller transactions occurred at or just after the time of the month when SNAP benefits are distributed.

*Attachment 2:  Multiple, rapid transactions by the same household*

94. For transactions alleged to be performed rapidly by the same consumer/household, the ALERT system flagged any two transactions conducted in under a twenty-four hour period.  The vast majority of the suspicious transactions included by Defendant on Attachment 2 occurred within just minutes of each other.

95. For example, on July 13, 2009, the African Store processed an eighty dollar SNAP transaction at 12:58:19 pm by household 493A, which was followed by another SNAP transaction by the same household for sixty dollars at 12:58:51 pm. This transaction is

listed as an identified suspicious transaction on both Attachment 1 (rapid transactions) and Attachment 2 (rapid transactions by the same household) to the Charge Letter. (See Def. Ex. 104A at USDA-00068 & USDA-00070.)

96. Plaintiffs' own SNAP receipts again confirm that, within seconds of that transaction, the African Store generated two receipts for the same SNAP benefits customer who processed transactions for eighty dollars and sixty dollars in a matter of only thirty-two seconds. (See Def. Ex. 128 at USDA-01042 (for card # 4932).)

97. Similarly, on June 6, 2009, over the course of just thirty-two minutes and four seconds, a customer from household #0633 conducted three separate SNAP transactions at the African Store for $199.99, $199.99 and $149.90, for a total of $549.88. (See Exhibit 104A at USDA-00074.) Plaintiffs' own SNAP receipts again validate that these transactions occurred. (See Def. Ex. 127 at USDA-00930 (for card # 9626).)

98. On specific days between May and July of 2009, there were ninety-four instances of multiple transactions made by the same account in an unusually short time frame which the government considered to be indicative of trafficking, totaling $9,311.25.

99. For Attachment 2, each individual transaction was counted as a violation, as opposed to the transactions included in the first category where the pair of consecutive transactions was counted as a single violation. When totaled in the same manner as Attachment 1, there were forty-four alleged occasions of consecutive transactions by the same consumer deemed too rapid to be credible, which works out to be an average of 14.6 such occasions per month.

*Attachment 3: "excessively large purchase transactions"*

100. For allegedly excessive transactions, the ALERT system flagged transactions in excess of $120.00, which is four times the average transaction amount for a Maine convenience store.

101. For example, on June 11, 2009, at 10:51:49 am, there was a SNAP transaction at the African Store by household 563A for $286.10. (See Def. Ex. 104A at USDA-00075.)

102. Again, Plaintiffs' own receipts confirm that within seconds of that transaction, the African Store generated a receipt for a SNAP transaction worth $286.10. (See Def. Ex. 127 at USDA-00940 (for card # 2626).)

103. There are fifty-eight such violations alleged (or an average of 19.3 per month) on specific days between May and July of 2009, ranging in dollar amount from $399.99 to $134.00, and totaling $10,211.82. Of these, twenty-one transactions were for amounts equal to or greater than $199.99.

**Plaintiffs' Verbal Response to the Charge Letter (September 23, 2009)**

104. After USDA issues a charge letter, the retailer is given the opportunity to meet and provide a verbal response.

105. On September 23, 2009, Hajifarah and Hirad met with Crosby in person and with USDA employee Robert Hughes over speaker phone.

106. Hajifarah and Hirad brought an interpreter to the meeting. They did not bring an attorney.

107. Despite the presence of the interpreter, Hajifarah sometimes spoke before the interpreter completed the translation, indicating to Crosby that Hajifarah understood English.

108. Prior to the meeting, Crosby verbally informed Hajifarah and Hirad that they could bring anything they thought would help explain the transactions.

109. At the meeting, Crosby asked if they brought any documentation; Hajifarah and Hirad responded that they had nothing.

110. Crosby asked Hajifarah to explain why some SNAP transactions were priced in dollars and cents, when the items in the store were priced in even dollar amounts; Hajifarah responded that some spices were priced in dollars and cents.

111. Crosby also asked about a high-dollar transaction for $399.99. Hajifarah responded that this had been a mistaken transaction made by his wife, Hirad. Hajifarah further explained that they knew the family and had called both the family and DHHS to correct the error.

112. After the meeting, Crosby looked into Hajifarah's explanation of the $399.99 transaction. Even though a retailer has the ability to just re-swipe a customer's card to restore money, Crosby was unable to locate any reversal of charges within forty-five days of the $399.99 transaction.

113. Crosby recorded her notes from the discussion in a document entitled Alert Case Sanction determination. (See Def. Ex. 108.)

**The Disqualification Determination (September 24, 2009)**

114. Based on the data compiled in the Charge Letter and in consideration of the September 23, 2009 verbal response, USDA made a determination to permanently disqualify the African Store from participation in SNAP for trafficking. Hajifarah and Hirad were informed of this decision by letter dated September 24, 2009. (See Def. Ex. 109.)

115. Around this same time, the SNAP EBT processor was disabled at the African Store.

116. By letter dated December 1, 2009, USDA issued its Final Agency Decision sustaining the permanent disqualification of Plaintiffs from participation in SNAP. (See Def. Ex. 118.)

117. More specifically, the Final Agency Decision states: "It is the decision of the USDA that the record indicates that African Store committed violations of [SNAP], and that there is sufficient evidence to support a finding that the permanent disqualification from participation as an authorized retailer in the program, as initially imposed by the Northeast Region Compliance Center … was appropriate." (Id. at USDA-00142.)

**Trial Witness Testimony & Photographic Evidence**

118. Both Hajifarah and Hirad specifically testified at trial that they did not exchange SNAP benefits for cash.

119. Although all of the testifying customer witnesses called by Plaintiffs likewise affirmatively stated that they had never exchanged SNAP benefits for cash at the African Store, not one was able to rebut any of the specific transactions that were charged by the United States as trafficking.

120. Both Hajifarah and Hirad testified at trial that, when the African Store is not busy or when their daughters are around to mind the store, Hirad will often offer to drive customers home after they have bought large quantities and/or heavy items at the store. Hirad stated that she makes such offers on a daily basis, and in conformance with the traditions of the Somali community, she never charges for this service. As a result of the offer of a ride, Hajifarah and Hirad explained, customers who had arrived on foot would sometimes decide to purchase additional items or even just request that Hajifarah double their prior order. To the extent this self-serving testimony was offered to explain multiple rapid transactions, the Court does not find this to be a credible explanation for the transactions.[6]

---

[6] Notably, this testimony regarding rides was not corroborated by any of the six customer witnesses Plaintiffs called to testify at trial, not one of whom testified that any purchases were in any way influenced by the unexpected offer of a ride, and only one of whom testified as to ever receiving such an offer at all. Additionally, this testimony also

121. Shukri Haji was the African Store customer who, on June 16, 2009, was involved in the $399.99 transaction included in the Charge Letter and discussed at the Verbal Response meeting. According to the stipulation of counsel and the electronic records, Haji engaged in two SNAP transactions that day: a $399.99 purchase followed by a $199.99 transaction 1 minute and 46 seconds later.

122. At trial, Haji corroborated Hajifarah and Hirad's similar testimony that the $399.99 transaction had been a mistake. According to this testimony, an extra "9" was added to the transaction amount when it was computed by Hirad, and Haji only noticed that she was charged $399.99 instead of $39.99 when she went home.

123. Hajifarah testified that, not knowing what to do about the mistake, he made telephone calls and went to his bank to try to correct this transaction. Hajifarah claims that he was unaware that he could have corrected this transaction on the SNAP EBT processing equipment at the African Store.

124. According to Haji, she has never received a refund for the $399.99 transaction. There is also no evidence that Haji received any food or other items from the store to otherwise compensate her for this admitted mistake on the part of Hirad and Hajifarah.

125. Hajifarah, Hirad and Haji did not provide any explanation for Haji's second rapid transaction of $199.99 made less than two minutes later.

126. Even though the $399.99 transaction was for over one hundred dollars more than any other "excessively large" transaction at the African Store identified by the government as suspicious, Hajifarah, Hirad and Haji's self-serving testimony fails to provide either a credible accounting for the size of this transaction or a reasonable explanation for the $199.99 transaction that followed.

---

conflicts with statements Hajifarah gave to Crosby, prior to being formally charged with trafficking, that the African Store offered no delivery service.

127. Mohamed K. Mohamoud was involved in one transaction for $36.00 at the African Store that was considered to be trafficking because, only seconds later, there was another transaction by a different customer for $100.00. At trial, Mohamoud could not recall any specifics regarding this transaction. Plaintiffs offered no credible explanation for the second transaction less than a minute later.

128. Mohamoud described his shopping experience at the African Store as follows: "I go inside and pick out the stuff I want to buy and bring it over to the counter and sometimes if I remember something I forgot, I would go back and the calculation would be done and that's how I do (sic)." (Tr. of Proceedings Vol. II at 120.)

129. Hersiyo Hersi was involved in two sets of transactions that were considered trafficking. The first set of transactions was on May 18, 2009 when Hersi used SNAP benefits at the African Store for transactions of $2.50 and $149.99 within one minute and thirty-four seconds. The second set of transactions was on June 29, 2009 when, within two minutes and one second, Hersi used SNAP benefits at the African Store for two transactions each worth $94.95. At trial, Hersi could not recall any specific details about those transactions.

130. Ardo Hussein and Abdi Karshe testified at trial regarding their use of SNAP benefits at the African Store. There was no evidence presented that either individual was engaged in any transactions that were considered to be trafficking by the government. Maryan Mohamed also testified about her use of SNAP benefits at a Somali specialty store; however, in her testimony, Mohamed specifically recalled purchasing fresh refrigerated goat meat, which is not sold at the African Store, and the Court therefore has accorded no weight to her testimony.

131. At trial, both Hajifarah and Hirad affirmatively acknowledged that prepared foods and ready-to-eat foods are ineligible for SNAP benefits, as are non-food items like clothing and diapers.

132. The Court finds that the photographs taken by Crosby during her initial visit to the African Store in April of 2008, though dated, offer the most accurate depiction of the conditions inside the retail space.  (See Def. Ex. 102 at USDA-00015 to USDA-00029.)

133. Crosby's photographs depict a store that is crowded and cluttered with non-food items such as phone cards, clothing, diapers and books.  The food shelves, which are limited in number, are filled with no more than twenty or so of each item (such as bags of rice, cans of oil and bags of flour) but appear to have no space for additional inventory.  The pictures also do not depict any sort of storage space that might contain additional food inventory.

134. By contrast, the photographs submitted by Plaintiffs at trial, depicting an orderly store with a more ample food supply, were taken only after Hajifarah and Hirad learned they were being accused of trafficking.  (See Pl. Ex. 12.)  These photographs depict what appears to be a completely different store than the one seen in photographs taken by Crosby in April of 2008 and the one described by Crosby in September of 2009.  For example, Plaintiffs' photographs show food items on the shelves in locations where previously there was no food (such as an entire section of oil that was previously absent). (Compare Pl. Ex. 12 with Def. Ex. 102.)

135. Photographic evidence of the conditions of the African Store suggest that the African Store does not carry a sufficient number of expensive items in its inventory to account for the identified transactions involving suspiciously high-dollar transactions.

136. These photographs also corroborate Crosby's conclusion that the African Store could not plausibly handle large and rapid transactions given its size and inventory.

## II.  CONCLUSIONS OF LAW

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 7 U.S.C. § 2023(a)(13) (providing an aggrieved store with the opportunity to obtain judicial review).

2.  Pursuant to the Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964) (now known as the Supplemental Nutrition Assistance Program), and its regulations regarding judicial review, found at 7 C.F.R. § 279.7, this Court has conducted a "trial de novo" and "determine[d] the validity of the questioned administrative action in issue".  7 § U.S.C. 2023(a)(15); 7 C.F.R. § 279.7(c).

3.  In making its independent determination of the issues, the Court need not limit itself to the administrative record.  See United States v. First City Nat'l Bank, 386 U.S. 361, 368 (1967); Fells v. United States, 627 F.3d 1250, 1253 n.4 (7th Cir. 2010) (quoting Kim v. United States, 121 F.3d 1269, 1272 (9th Cir. 1997)); Ramirez v. United States, 514 F. Supp. 759, 763 (D. P.R. 1981).

4.  Plaintiffs, as the parties challenging their removal from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was "invalid."  7 § U.S.C. 2023(a)(16); see also Procedural Order (Docket # 32) (explaining legal reasoning on assignment of burden of proof and collecting cases); Fells v. United States, 627 F.3d 1250, 1253 (7th Cir. 2010).  In other words, here Plaintiffs had the burden of proving that they were improperly disqualified from participation in SNAP.  See, e.g., Redmond

v. United States, 507 F.2d 1007, 1011-12 (5th Cir. 1975) ("[T]he agency action stands, unless the plaintiff proves that it should be set aside.").

5. In order to make the required determination, the Court examines the evidence on a fresh record rather than determining whether the administrative decision was supported by substantial evidence. Ibrahim v. United States, 834 F.2d 52, 53-54 (2nd Cir. 1987). See also Redmond, 507 F.2d at 1012 (plaintiffs "may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency, and the agency itself may offer any evidence available to support its action, whether or not in the administrative record").

6. Plaintiffs have failed to carry their burden of showing they were not trafficking in SNAP benefits by means of exchanging said benefits for cash.

7. By failing to show that they did not traffic in SNAP benefits, Plaintiffs have failed to carry their burden of showing by a preponderance of the evidence that the agency action was invalid.[7]

8. As such, the Court upholds the Final Agency Decision to permanently disqualify Plaintiffs from participation in SNAP.

## III. DISCUSSION

In this case, Plaintiffs seek judicial review of the United States Department of Agriculture, Food and Nutrition Service's Final Agency Decision, which permanently disqualified them from participating in the Supplemental Nutrition Assistance Program, formerly

---

[7] The ultimate outcome here would not have been any different had the Court placed the burden of proof on the United States rather than Plaintiffs. For, the Court would also find that the United States has shown by a preponderance of the evidence that Plaintiffs engaged in trafficking of SNAP benefits by means of exchanging said benefits for cash and, correspondingly, have shown by a preponderance of the evidence that the agency action was valid.

known as the Food Stamp Program. 7 U.S.C. § 2023(a)(13). FNS disqualified Plaintiffs after finding that, from May through July 2009, Plaintiffs violated the terms of the Supplemental Nutrition Assistance Program, 7 U.S.C. §§ 2011-2036 and governing regulations, 7 C.F.R. §§ 271 et seq. More specifically, Plaintiffs were disqualified for "trafficking" SNAP benefits, which, as relevant to this case, is "the buying or selling of coupons, ATP cards or other benefit instruments for cash". 7 C.F.R. § 271.2. The three categories of trafficking violations found by FNS consisted of: (1) "Multiple purchase transactions [that] were made too rapidly to be credible"; (2) "Multiple withdrawals [that] were made from individual benefit accounts in unusually short time frames; and (3) "Excessively large purchase transactions [that] were made from recipient accounts." (See Gov't Ex. 118 (Final Agency Decision) at USDA-00143.) Plaintiffs challenge these violations, and in turn, their permanent disqualification.

Plaintiffs' Complaint requires the Court to "determine the validity of the agency's factual determinations anew, on a fresh record." McGlory v. United States, 763 F.2d 309, 311 (7th Cir. 1985) (per curiam) (citation omitted). A plaintiff can prove the "determination invalid by demonstrating 'that the factual determination [made by the USDA] was wrong.'" Fells, 627 F.3d at 1253-54 (quoting McGlory, 763 F.2d at 311). In its pretrial order, the Court determined that overwhelming case law made clear that the Plaintiffs, as the party challenging the administrative action, have the burden of proving by a preponderance of the evidence that the agency's final determination is invalid. See Procedural Order (Docket # 32) (explaining legal reasoning and collecting cases). "Implicit in this statement is that it is incumbent upon [Plaintiffs] to establish" at the outset that Defendant determined incorrectly that Plaintiffs had engaged in trafficking. Fells v. United States, No. 08-C-782, 2010 WL 55844, at *5 (E.D. Wis. Jan. 5, 2010). After de novo review, the Court concludes that Plaintiffs have failed to carry their burden.

At trial and throughout the administrative process, Plaintiffs adamantly denied ever engaging in trafficking. Plaintiffs have provided a number of explanations as to how and why transactions flagged by the government as indicative of trafficking could have, in fact, occurred legitimately. While it is possible that Plaintiffs' assertions of culturally-based shopping differences might explain a few of the suspect transactions, the evidence of trafficking now before the Court remains overwhelming and, for the large part, undisputed.

As to "[m]ultiple purchase transactions [that] were made too rapidly to be credible," Hajifarah and Hirad, for example, testified that majority of their customers travel to the store in large groups. When the African Store is busy, Plaintiffs claim they do what is necessary to process their customers' transactions quickly in order to avoid having them wait around in line for an inordinate amount of time. Thus, under busy conditions, Plaintiffs suggest that Hirad or her daughters would calculate the total of transactions for customers in line and relay that amount to Hajifarah who could process one transaction after another without specifically handling or calculating each individual item in each individual transaction. Similarly, Plaintiffs testified that rapid transactions conducted by the same household might occur because individual customers had forgotten items when they were initially rung up and had to get more items, or discovered while paying for their food items that another customer or Hirad could give them a ride home so they could purchase double what they originally had planned. In short, Plaintiffs argue that, unlike a store such as Wal-Mart—where the store must scan each individual item before the individual customer can pay, and the same process must be repeated with the next customer—the lack of technology at the African Store actually facilitates the speed of its transactions.

As to "[m]ultiple withdrawals [that] were made from individual benefit accounts in unusually short time frames," Plaintiffs additionally suggest that due to transportation issues,

customers often walk to the African Store multiple times a day to shop, particularly when they are shopping for bulk items such as a forty pound bag of rice. Finally, as to "[e]xcessively large purchase transactions [that] were made from recipient accounts," Plaintiffs provided testimony and evidence to suggest that large families are common in the Somali community, and as a result, customers buying in bulk could easily accumulate $200.00 worth of food products—by, for example, purchasing two bags of rice (at $56.00 each), a large container of olive oil (at $30.00), a large container of Nido (at $29.00) and another item or two such as bags of pasta.

These conjectural explanations are not persuasive and are not borne out by the evidentiary record. First, even if the Court were to fully credit the testimony of customers appearing on behalf of Plaintiffs—which it does not—there are just too many suspicious transactions for the Plaintiffs' story to hold water. Attachments 1 through 3 of the Charge Letter outline the transactions that the government regards as suspicious. There are 159 transactions totaling $25,965.67, spanning over the course of just three months.[8] On many of these days, there were more than five suspicious transactions. These alleged violations were conducted by numerous different households, with many of the transactions being the product of returning customers. The fact of these transactions in the Charge Letter are confirmed by Plaintiffs' own SNAP receipts which appear to confirm each suspicious transaction's date, time and dollar-value.

None of the testifying customers were able to rebut any of the specific transactions that were charged as trafficking. What is more, not one of the testifying witnesses provided details that aligned with or helped corroborate Plaintiffs' story. No customer witness testified about travelling to the store in a large group. No customer described verbally informing the person

---

[8] While it is true that many of these transactions were counted as a violation more than one time by United States, the total number of suspicious transactions remains overwhelming.

working the counter what s/he wished to buy, before actually going back into the store to physically gather the now-purchased items.[9]  No customer witness described adding or doubling his/her order upon learning that Hirad could and would provide a ride.[10]  Plaintiffs' theories sound compelling in the abstract, but they simply are not supported by a preponderance of the evidence.

It is true that the government's case largely rests on the opinion of Crosby, her interpretation of transaction data and her expectations regarding the shopping habits of SNAP clients which may or may not have fully taken into account identified differences in the shopping habits of the Somali community.  Indeed, "[t]here is no smoking gun; no undercover video of [Plaintiffs] agreeing to exchange food stamps for cash; no food stamp client saying he sold his food stamps to [Plaintiffs] for cash."  Fells, 2010 WL 55844, at *6.

However, Crosby's testimony is largely corroborated by her contemporaneous photographs, store observations and reports, which convincingly demonstrate that Plaintiffs' explanations are implausible in a number of ways.  The Court has found that for every SNAP transaction, the customer must be in the physical presence of the PIN device.  Even assuming a customer changed her mind about a purchase, the transactions are unlikely for a small, cluttered, and crowded convenience store like the African Store, where there are few high-dollar products and only one point-of-sale device—especially when the Court takes into consideration Plaintiffs' own multi-step description of a typical transaction.  (See Tr. of Proceedings Vol. I (Docket # 42) at 53-61; 110-113.)  There was evidence that qualified SNAP food items were priced in even

---

[9] In fact, one customer, Mahamoud, described essentially the opposite.  (See Tr. of Proceedings Vol. II at 120 ("I go inside and pick out the stuff I want to buy and bring it over to the counter and sometimes if I remember something I forgot, I would go back and the calculation would be done and that's how I do (sic)."))

[10] Indeed, only one customer, Haji, described ever receiving a ride at all from Hirad.  And, this customer qualified her testimony by adding "Well, it didn't happen often.  It might have happened once or so, but majority (sic) of the time, I have my own car when I go there."  (Tr. of Proceedings Vol. II at 142.)

dollar amounts, yet the electronic records of the African Store's SNAP transactions reflect numerous transactions that are priced in dollars and cents.

Photographs and stock inventory lists make clear that the African Store had both limited volume and variety of food items. This limited inventory, which was not disputed by any evidence which the Court credits, casts into doubt any incentive a SNAP household might have to repetitiously visit the Store and make legitimate purchases multiple times in less than twenty-four hours. The merchandise and services offered at the African Store are readily available to customers at other retail food stores which carry a wider variety of food stock, including fresh meats, dairy and produce. And, finally multiple high dollar value transactions are certainly suspicious for a store that had been observed by Crosby as having a very small stock of eligible food items. For example, between June 16 and 18, 2009—just a few days after the distribution of SNAP benefits for that month—there was one $238.00 transaction and three $199.99 transactions. Over the course of the three month period in question, there were twenty-one transactions between the range of $199.99 and $399.99. The African Store simply did not carry sufficient inventory of SNAP eligible items to support these repeat, high-dollar amount purchases.

IV. CONCLUSION

In short, based on the administrative record, the additional evidence provided to this Court, and the arguments made by counsel, the Court finds that the preponderance of the evidence does not support the Plaintiffs' position that the three categories of trafficking

violations charged did not occur.  Rather, the resulting decision to permanently disqualify Plaintiffs from participation in the SNAP program finds ample support in the record.[11]

Accordingly, the Court affirms the decision of the agency and enters judgment against Plaintiffs and in favor of the United States.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 26th day of April, 2011.

---

[11] FNS has the authority to permanently disqualify a store on the first occasion of a trafficking violation, but under certain circumstances an alternative sanction may be available.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). "Whereas the FNS finding that a firm violated the Food Stamp Act is reviewed de novo, review of the sanction imposed by the FNS is governed by the arbitrary and capricious standard."  Wong v. United States, 859 F.2d 129, 132 (9th Cir. 1988).  Here, Plaintiffs do not challenge the specific sanction imposed, rather, they challenge the fact that they were sanctioned at all.